CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 31, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

LARRY YOUNG, JR.,                      )
                                       )
            Plaintiff,                 )       Case No. 7:23-cv-00263
                                       )
v.                                     )       **MEMORANDUM OPINION**
                                       )
KILINE MADISON *et al.*,               )       By:    Hon. Thomas T. Cullen
                                       )              United States District Judge
            Defendants.                )

Plaintiff Larry Allen Young, Jr., proceeding *pro se*, filed a civil-rights action pursuant to

42 U.S.C. § 1983 against Defendants Kiline Madison, Lt. Rebecca Moody, Sgt. Christopher

Norvelle, and Elizabeth Wheeler. Defendants Madison, Moody, and Norvelle jointly moved

for summary judgment on Plaintiff's claims against them. (*See* Defs.' Mot. for Summ. J. [ECF

No. 34].) Thereafter, Defendant Wheeler filed a separate motion for summary judgment,

adopting and incorporating the arguments raised by the other defendants. (*See* Def. Wheeler's

Mot. for Summ. J. [ECF No. 53].) For the reasons discussed below, the court will grant both

motions and enter judgment in favor of Defendants.

## I.

This action is one of many Plaintiff has filed concerning the conditions of his pretrial

confinement on various criminal charges in Madison County and Orange County. (*See* Compl.

at 2, 4–6 [ECF No. 1].) Plaintiff's claims in this action derive from events incident to his arrest,

search, and seizure on February 25, 2022, at the Town of Orange Police Department in

Orange, Virginia. (*See generally id.* at 12–63.)

## A. Plaintiff's Allegations[1]

Plaintiff alleges that, on the night of February 24, 2022, after realizing that his wife and children were no longer in Plaintiff's home and after several unsuccessful attempts to contact his wife, Plaintiff called the Town of Orange Police Department, told the department that his daughter had been kidnapped and that he suspected his wife was involved and requested that the department issue an AMBER alert for his daughter and a BOLO for his vehicle, which was also missing. (Compl. at 8–10.) The female officer who answered Plaintiff's call informed Plaintiff that, because he and his wife were married, his wife could not kidnap their daughter or steal his vehicle. (*Id.* at 10.) She further informed Plaintiff that his complaints were civil issues and that the police department would not become involved. (*Id.*)

Plaintiff contacted his brother and asked him to come to Plaintiff's house and pick him up. (*Id.* at 10–11.) While waiting for his brother to arrive, Plaintiff armed himself. (*Id.* at 11.) Then, he and his brother drove to Plaintiff's in-laws' home in Fork Union, Virginia. (*Id.*) Once there, Plaintiff climbed over the closed gate to his in-laws' home, walked up to the house, and saw through a window that his daughter was there and was being held by Plaintiff's brother-in-law. (*Id.* at 11–12.) Upon seeing Plaintiff, Plaintiff's brother-in-law took Plaintiff's daughter away from the window and further into the house. (*Id.* at 13.) Plaintiff then tried to contact the Fluvanna County Sheriff's Office, but his calls to that office went unanswered. (*Id.* at 12–14.)

---

[1] Plaintiff's complaint includes several pages of allegations not related to the arguments raised in Defendants' motions for summary judgment. (*See* Compl. at 7–20.) For the sake of brevity, the court does not summarize all of these allegations.

Plaintiff and his brother drove to Plaintiff's brother's home where Plaintiff then borrowed a vehicle from his brother. (*Id.* at 14–15.) Plaintiff then drove himself, alone, back to his home. (*Id.* at 15.) Upon realizing that he had inadvertently locked himself out of the home, Plaintiff drove back to his in-laws' home. (*Id.*) While on the way, Plaintiff received a call from Defendant Kiline Madison, the Chief of Police of the Town of Orange. (*Id.*) Plaintiff and Madison were acquainted and had a history of complicated, unfriendly personal interactions. (*See id.* at 16, 18–21.) On the phone, Madison told Plaintiff that, "if [he] wanted to know what had happened to [his] family," he needed to go to the Town of Orange Police Department. (*Id.* at 16.)

Plaintiff arrived at the police department at around 3:50 a.m. on February 25, 2022. (*Id.*) Upon arriving, he saw Madison waiting for him in front of the glass doors to the building. (*Id.*) After Plaintiff parked and exited his brother's truck, Madison asked Plaintiff whether he was armed. (*Id.* at 17.) When Plaintiff answered in the affirmative, Madison told him to secure his weapon in the truck. (*Id.*) "[F]earing for [his] personal safety," Plaintiff responded that he "was a legally armed citizen" and told Madison that Madison did not have authority to disarm him "just because he wanted to." (*Id.* at 17, 21.) Madison told Plaintiff that he would not be permitted to enter the police department unless he disarmed. (*Id.* at 21.) Plaintiff replied that he did not want to enter the building but only wanted information about his family and advised that any other communications Madison or other officers wanted to have with him "could be conducted through [Plaintiff's] attorney." (*Id.* at 22.) Madison told Plaintiff that "he would not communicate with [Plaintiff's] attorney, only with [Plaintiff]" and advised that he would not

tell Plaintiff any information about his family unless he disarmed and entered the police department. (*Id.*)

At that point, Plaintiff secured his weapon in his vehicle and entered the building with Madison. (*Id.*) Upon entering, Madison and Defendant Rebecca Moody escorted Plaintiff to a conference room. (*Id.* at 22–23.) Neither Madison nor Moody were wearing body cameras. (*Id.* at 23.) Once in the conference room, Madison told Plaintiff to turn around and then performed a "frisk search" of Plaintiff, which involved lifting up Plaintiff's sweatshirt. (*Id.*) Madison then closed the conference-room door and advised Plaintiff of his *Miranda* rights. (*Id.*) Madison also told Plaintiff that the door was unlocked and that he was free to leave at any time. (*Id.*) But, according to Plaintiff, Madison was blocking the door and "[t]he atmosphere of the room wholly contradicted what Chief Madison was saying." (*Id.*)

Madison proceeded to ask Plaintiff if he was carrying a concealed weapon permit. (*Id.* at 25.) Although Plaintiff did not want to answer without his attorney present, he claims he "knew if [he] did not answer Chief Madison's questions, that [he] would not discover what had occurred to [his] family." (*Id.*) Therefore, Plaintiff answered, telling Madison that he did have his permit. (*Id.* at 26.) After asking other questions, Madison asked Plaintiff if he had been fighting with his wife. (*Id.*) Plaintiff suspected that any information he revealed would not lead to a "legitimate investigation" but would instead be used to "extort" him. (*Id.*) He therefore told Madison that he had not been arguing with his wife and that they "had a wonderful marriage." (*Id.* at 27.)

Madison then told Plaintiff that his wife had come to the police department earlier that night and had reported that Plaintiff's five-year-old stepson had told her that Plaintiff had

made him watch while he had sexual intercourse with Plaintiff's six-year-old stepdaughter. (*Id.*) Madison then asked other questions about Plaintiff's interactions with his stepdaughter and about Plaintiff's employment status. (*Id.* at 28–29.) Dissatisfied with Plaintiff's answers, Madison raised his voice at Plaintiff, accused Plaintiff of lying, and told Plaintiff that his wife and stepdaughter were currently at the University of Virginia Hospital with a police investigator. (*Id.* at 28–30.) Madison told Plaintiff to "[j]ust come clean and admit [he] did this," and claiming that "[w]hen people are truthful with us, we will always be more lenient in how much time they get." (*Id.* at 30.)

Plaintiff then told Madison and Moody that he wished for his attorney to be contacted and present before proceeding with further questioning. (*Id.* at 30–31.) At that point, Madison stood up, "slammed a white piece of paper down on the table," and told Plaintiff, "too bad, here's a warrant for your DNA." (*Id.* at 31.) Madison then instructed Moody to "proceed." (*Id.*) Moody told Plaintiff to open his mouth, and Plaintiff complied. (*Id.* at 32.) Moody then swabbed the inside of his cheek and gums and exited the room. (*Id.*)

After Moody left, Defendant Christopher Norvelle entered the room carrying a box. (*Id.*) Norvelle asked Madison if he should turn on his body camera, but Madison told him, "no." (*Id.* at 33.) Upon Madison's instruction, Plaintiff emptied his pockets onto the table in front of him. (*Id.* at 33–34.) Among the items Plaintiff removed from his person was a pocketknife. (*Id.*) Madison picked up the knife, opened it, felt the blade edge, and told Plaintiff, "this is a nice blade." (*Id.*) Then, while still holding the open pocketknife, Madison told Plaintiff to remove his belt. (*Id.*)

Plaintiff did so, and also followed instructions to remove his shoes. (*Id.* at 35.) Madison then directed Plaintiff to walk to a square of butcher paper on the floor in the corner of the room, and once Plaintiff was on the paper, he instructed Plaintiff to remove his pants. (*Id.* at 35–36.) Plaintiff did so and informed Madison, in response to Madison's question, that those were the only pants Plaintiff had worn that day. (*Id.* at 36–37.) After gathering and inspecting the pants, Madison told Plaintiff to remove his boxers, too. (*Id.* at 37.) Plaintiff complied, and Madison examined the boxers then placed them in a bag. (*Id.*) Madison also asked Plaintiff if he had showered that day, and Plaintiff answered that he had not. (*Id.*)

Plaintiff then stood unclothed from the waist down for 15 minutes in the corner of the room while Madison and Norvelle filled out paperwork at the conference room table. (*Id.* at 37–38.) Madison then used Plaintiff's pocketknife to open the box Norvelle had carried into the room. (*Id.* at 38.) The box appeared to be a Physical Evidence Recovery Kit, which Madison "rummag[ed] through" using Plaintiff's "dirty pocket knife" and Madison's bare hands. (*Id.*) After a few more minutes, Plaintiff grew cold and attempted to cover himself by pulling down his sweatshirt, but Madison told him to uncover his genital area. (*Id.*) A few minutes later, Madison approached Plaintiff, took Plaintiff's penis between his fingers and "began rotating and twisting it from left to right." (*Id.* at 39.) Madison then swabbed Plaintiff's penis with a cotton swab, which Plaintiff claims "caused [him] and immense amount of pain." (*Id.*) Madison rubbed the same swab against Plaintiff's genital warts, pressing so hard it caused them to bleed. (*Id.* at 39–40.) Madison then squeezed Plaintiff's penis against Plaintiff's thigh before releasing him. (*Id.* at 40.)

Next, Madison told Plaintiff to lift his penis and rubbed the same swab against Plaintiff's testicles. (*Id.*) Madison proceeded to swab around Plaintiff's genital area using the same cotton swab for another 30 seconds. (*Id.* at 40–41.) Then, Madison placed the swab in a bag. (*Id.*) Madison returned with a paper towel sheet, which he used to lift Plaintiff's penis and testicles, and instructed Plaintiff to remove a sample of pubic hair using his hands. (*Id.* at 41.) Shocked, Plaintiff looked to Norvelle, who he claims appeared not to agree with what was happening. (*Id.* at 41–42.) But after Madison repeated his instructions, Plaintiff complied and placed the removed hair on the paper towel. (*Id.* at 42.) This caused Plaintiff significant pain and some additional bleeding. (*Id.* at 43.)

While Plaintiff remained waiting in the corner, he heard female officers laughing and commenting on his body from outside the door. (*Id.* at 44.) After another few minutes, Defendant Elizabeth Wheeler entered the room and handed Madison a pair of pants. (*Id.*) Madison gave the pants to Plaintiff and told him to get dressed. (*Id.*) The pants were dirty and too large, but Plaintiff complied with Madison's directive out of fear. (*Id.* at 45.) Plaintiff had remained silent the entire time he stood unclothed. (*Id.*)

After Plaintiff put on the pants Madison had given him, Madison handed him a piece of paper and told him that he could not have any contact with his two-year-old daughter, his five-year-old stepson, or his six-year-old stepdaughter. (*Id.* at 45–46.) Madison also told him that his wife had been granted full possession of Plaintiff's home and vehicle. (*Id.* at 46–47.) When Plaintiff asked if he could return to his house to gather personal items, Madison told him he could not enter the home under any circumstances, and he would be arrested on site if found there. (*Id.* at 48.) Madison and Norvelle also confiscated his handgun, holster,

magazine caddy, and ammunition, and told Plaintiff he was not allowed to possess any weapons. (*Id.* at 48-49.) Moody and Wheeler were also present as Plaintiff's weapons materials were confiscated, and according to Plaintiff, had watched what had transpired in the conference room from a television monitor in another room. (*Id.* at 49.)

Madison led Plaintiff out of the building and, as he shut the door, told Plaintiff that he "hoped [Plaintiff] enjoyed cold weather." (*Id.* at 50.) When Plaintiff returned to his brother's truck, he discovered that the truck had been searched and the driver's side door was locked. (*Id.*) Plaintiff also realized that the keys to the truck had not been returned to him. (*Id.*) But, when Plaintiff returned to the police department doors, they were locked, and he could not reenter the building. (*Id.*) Plaintiff alleges it was 25 degrees Fahrenheit outside, and he was wearing only a sweatshirt and the pants that had been given to him. (*Id.* at 51.) Plaintiff knocked on the door on and off for ten minutes with no response. (*Id.*) He then called the phone number listed on the front door of the building, but no one answered. (*Id.*) He also knocked on a window in Madison's office and called the number from which Madison had called him earlier that night to no avail. (*Id.*)

After 20 minutes of waiting outside, Plaintiff called the Orange County Emergency Communication's Center and informed the dispatcher of the situation. (*Id.* at 52–53.) The dispatcher told Plaintiff to standby at the front doors and hung up. (*Id.* at 53.) Five minutes later, Madison and Wheeler opened the front door. (*Id.*) They were discussing Plaintiff when they answered the door, and Madison proceeded to ask Plaintiff if he had any sexually transmitted diseases. (*Id.* at 54.) Madison told Plaintiff that his stepdaughter had already received a "SANE" at the UVA hospital's pediatric emergency room. (*Id.* at 54–55.) Madison

also told him that the hospital had found evidence that she had been sexually assaulted and that she had identified Plaintiff as the perpetrator. (*Id.* at 55.) Madison told Plaintiff that he could have his truck keys back if he admitted to sexually abusing his stepdaughter. (*Id.*) Plaintiff claims that because he was disarmed, "had nearly frozen to death," and because Madison carried a handgun, he "knew at that time [that] if [he] did not confess . . . Madison would either allow [him] to freeze to death, or physically assault [him]." (*Id.* at 55–56.) Plaintiff then told Madison that he had sexually assaulted both his stepson and stepdaughter, twice. (*Id.* at 56.) Madison countered that he knew Plaintiff had assaulted them more than twice and told Plaintiff that, if he admitted as much, Madison would "make [him] a deal." (*Id.*) "In another attempt to get [his] truck keys back," Plaintiff told Madison that he had sexually assaulted his stepson and stepdaughter 20 to 30 times since 2019. (*Id.*) Madison then took his phone out of his pocket and told Plaintiff that everything he had just said had been recorded. (*Id.*)

Plaintiff alleges that Madison told him that "he knew [Plaintiff] didn't sexually assault [his] children, but he could not let everyone else know." (*Id.* at 56–57.) Plaintiff then told Madison that his wife and her ex-husband had been sexually assaulting the children while Plaintiff was at work. (*Id.* at 57.) Then, Madison told Plaintiff that he had come to the police station in the middle of the night specifically to entrap Plaintiff as recompence for Plaintiff reporting a prior affair of Madison's. (*Id.* (alleging Madison told him, "Now whose got who by the balls?").) Plaintiff told Madison, "You all win, I lose, just tell me what I need to do to make this go away[.]" (*Id.* at 58.) Madison provided three conditions: first, his house, property, vehicle, and daughter were to all go to Plaintiff's wife; second, Plaintiff had to pay Madison $10,000; and third, Plaintiff had to leave the State of Virginia "and never come back." (*Id.*)

Madison said that the first condition was to do to Plaintiff "what [he] tried to do to [Madison]"—to "make [him] lose everything [he] ha[d]." (*Id.*) Madison stated that the second condition to was guarantee that Madison did not file anything with child protective service or have him prosecuted by the Commonwealth Attorney. (*Id.*) And finally, Madison told him that the third condition was "for all the shit [Plaintiff] ha[d] started around here." (*Id.*)

Plaintiff agreed to the conditions but stated that he would need time to secure the money for Madison. (*Id.*) Madison said that he could have until 6:00 p.m. that day to get the money. (*Id.* at 58–59.) He also threatened that if Plaintiff tried to run or double cross him, he would have a warrant issued for Plaintiff's arrest and have fabricated evidence forwarded to child protective services. (*Id.* at 59–60.) Only then did Madison return the truck keys to Plaintiff. (*Id.* at 60.) When Madison handed over the keys, they were wrapped in a sticky note listing the address where Plaintiff was to drop the money. (*Id.*) Immediately thereafter, Plaintiff got in his truck and left the police department. (*Id.*)

Plaintiff raises six § 1983 claims based on these allegations. (*See id.* at 60–63.) First, he claims that all Defendants violated the Fourth Amendment by "utiliz[ing] a Magistrate issued search warrant to search and seize [him]" and by "fail[ing] to take adequate steps to minimize [his] physical and emotional trauma" during the search, including by "fail[ing] to ensure the sterility of the environment [he] was exposed to" and by "show[ing] no regards for [his] personal privacy." (*Id.* at 60–61.) Second, he claims that all Defendants violated the Fourth Amendment by "utiliz[ing] a Magistrate issued search warrant to isolate and interrogate him" after he invoked his Fifth Amendment right to remain silent and his right to an attorney. (*Id.* at 61.) Third, Plaintiff claims that all Defendants violated the Fourth Amendment by "seiz[ing]

[his] vehicle keys[] and lock[ing] [him] outside of the police department in the dark, and in freezing weather, for approximately 45 minutes." (*Id.*) Fourth, Plaintiff claims that all Defendants violated the Fourth Amendment by unlawfully seizing his handgun, magazines, ammunition, holster, and magazine caddy—and failing to return them to Plaintiff—because the search warrant "only stated to search for known DNA, physical evidence of sexual assault . . . , and clothing." (*Id.* at 62.) Fifth, Plaintiff claims that all Defendants violated the Fourth Amendment and Eighth Amendment "by stripping [him] naked with an open pocket knife visible, making [him] stand for a prolonged period of time nude, sticking a cotton swab into [his] . . . urethra, rubbing [his] genital warts . . . until they bled, forcing [him] to rip out [his] pubic hair . . .with his bare hands, squeezing [his] penis and testicles with a bare hand until it hurt [him], and locking [him] outside in freezing weather at night, and alone, for a prolonged period of time." (*Id.* at 62–63.) Sixth, Plaintiff claims that Defendant Madison violated his Fourteenth Amendment rights to equal protection and due process of law by "blackmailing" and "extorting" him using his criminal allegations "because of who [he] [is]" and by turning over Plaintiff's house, property, vehicle, and daughter to Plaintiff's wife "due to [Madison's] vendetta against [Plaintiff]." (*Id.* at 63.)

## B. Defendants' Evidence

Defendants produced documentary and video evidence showing that, on February 25, 2022, at approximately 1:48 a.m., the Town of Orange Police Department obtained a search warrant for Plaintiff's DNA based on an affidavit from Defendant Moody. (Ex. A to Defs.' Mot. for Summ. J. [ECF No. 35-1].) The search warrant authorized a search consisting of

"[k]nown DNA by swab, physical evidence of sexual assault from genital area to include a swab for vaginal and seminal fluid, pubic hair, [and] clothing from [Plaintiff]." (*Id.*)

According to Defendants' evidence, Plaintiff arrived at the police department at around 4:45 a.m. that day and was questioned by Madison in a conference room, in Moody's presence. (Ex. B to Defs.' Mot for Summ J. [ECF No. 35-2]; Ex. B, Att. A to Defs.' Mot. for Summ. J. (video of interview of Plaintiff).) Madison told Plaintiff that he had been accused of sexually assaulting Plaintiff's children and asked Plaintiff if he would consent to a search of his DNA. (Ex. B, Att. A to Defs.' Mot. for Summ. J.) When Plaintiff declined and invoked his right to counsel, Madison informed Plaintiff that he had a search warrant for his DNA. (*Id.*) He also told Plaintiff that he had a protective order against Plaintiff and that, as a result, Plaintiff would need to turn over his weapons and concealed weapons permit. (*Id.*) Madison did not slam the copy of the warrant on the table or tell Plaintiff to "[j]ust come clean and admit [he] did this." (*Id.*) And Madison did not tell Plaintiff that "[w]hen people are truthful with us, we will always be more lenient on how much time they get." (*Id.*)

Moody brought an evidence collection kit into the conference room and proceeded to swab the inside of Plaintiff's mouth to obtain his DNA. (*Id.*) Moody left before the collection of DNA evidence from Plaintiff's genital area, but Defendants Madison and Norvelle were present for the collection of that evidence. (*Id.*; Ex. C to Defs.' Mot. for Summ. J. [ECF No. 35-3].) Before Madison collected the DNA evidence, Madison had Young empty his pockets onto the table. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.)

Moody and Defendant Wheeler remained in a patrol room but were not remotely monitoring the collection of DNA evidence from Plaintiff's genital area. (*See* Ex. B to Defs.'

Mot. for Summ. J ¶¶ 9, 12–13.) And although Madison's collection of DNA evidence was recorded, Plaintiff's genitals are not visible on the recording because of the location of the camera in the conference room. (*Id.* ¶ 14; Ex. B, Att. A to Defs.' Mot. for Summ. J.) Madison intentionally told Plaintiff where to stand in relation to the camera so that his genitals would not be exposed during the recording. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.)

Madison wore gloves during the collection process. (*Id.*) Plaintiff was unclothed from the waist down for approximately 12 minutes. (*Id.*) At no point did Madison order Plaintiff to uncover his genital area, and at no point did Plaintiff complain, grimace, or cry out due to pain. (Ex. C to Defs.' Mot. for Summ. J. ¶ 8.) Norvelle did not observe any bleeding or other signs of harm to Plaintiff's genital area after the collection was completed nor any signs of aggression from Madison during the collection process. (*Id.* ¶¶ 9–10.) And Norvelle avers that Plaintiff's genitals were exposed no longer than necessary to properly collect the DNA evidence. (*Id.* ¶ 13.)

Plaintiff voluntarily surrendered the keys to his truck so that an officer could retrieve the handgun Plaintiff had stored in the vehicle. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.) Plaintiff acknowledged that he could not possess a weapon under the emergency protective order and voluntarily turned over his holster and magazine as well. (*Id.*) Wheeler removed the handgun from Plaintiff's vehicle using the keys he had given her. (*See* Ex. B, Att. B to Defs' Mot. for Summ. J.)

After Plaintiff was permitted to leave the station, he returned to and knocked on the front door. (Ex. B, Att. C to Defs.' Mot. for Summ. J.) Madison met Plaintiff at the door, accompanied by another officer wearing a body camera, which recorded their interaction. (*Id.*)

At no point during the interaction did Madison tell Plaintiff he could have his truck keys if he admitted to sexually abusing his children. (*Id.*) And Plaintiff at no point told Madison that he had sexually assaulted his children twice or twenty to thirty times. (*Id.*) Madison did not offer Plaintiff any deals, tell Plaintiff he knew he was innocent, or make any of the threats or statements described in Plaintiff's complaint. (*Id.*)

### C. Plaintiff's Evidence

In response to Defendants' motions for summary judgment, Plaintiff submitted two 80-page declarations and hundreds of pages of records from investigations and criminal proceedings that have no meaningful bearing on Plaintiff's allegations in this case. (*See* Decl. of L. Young, May 28, 2024 [ECF No. 38]; Decl. of L. Young, Dec. 11, 2024 [ECF Nos. 58, 58-1].) Of the evidence Plaintiff offers, only his own declarations—which largely repeat the allegations of his complaint—purport to contradict the evidence supplied by Defendants.

### II.

Summary judgment under Rule 56 "allows a case to be resolved before and without a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). "The court's role in ruling on such a motion is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.*

In deciding a motion for summary judgment, "the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen*

*v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022) (internal quotation omitted). But the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if there are genuine disputes of material fact and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, but is appropriate "when the evidence is so one-sided that one party must prevail as a matter of law." *Tekmen*, 55 F.4th at 959 (internal quotation omitted).

## III.

Plaintiff brings his claims under 42 U.S.C. § 1983, which authorizes a civil action by a citizen who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. Claims under § 1983 have two essential elements: (1) "[a] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States," and (2) the plaintiff "must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988).

## A. Fourth Amendment Claims

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California*, 384 U.S. 757, 768 (1966). "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).

Plaintiff claims that Defendants Madison, Moody, Norvelle, and Wheeler all violated his Fourth Amendment rights by:

(i)   "fail[ing] to take adequate steps to minimize [his] physical and emotional trauma" during his search, including by "fail[ing] to ensure the sterility of the environment [he] was exposed to" and by "show[ing] no regards for [his] personal privacy";

(ii)  "isolat[ing] and interrogat[ing] him" after he asked for an attorney;

(iii) "seiz[ing] [his] vehicle keys[] and lock[ing] [him] outside of the police department in the dark, and in freezing whether, for approximately 45 minutes"; and

(iv) unlawfully seizing his handgun, magazines, ammunition, holster, and magazine caddy and failing to return them to Plaintiff.

(Compl. at 60–62.) Defendants are entitled to summary judgment on each of Plaintiff's Fourth Amendment claims.

First, Plaintiff has not shown a Fourth Amendment violation based on his allegations concerning the collection of his DNA. It is true that using a cotton swab to collect DNA samples is a search for Fourth Amendment purposes. *Maryland v. King*, 569 U.S. 435, 446 (2013)

("Virtually any intrusion into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny." (internal quotations omitted)). But, importantly, "[w]here an alleged Fourth Amendment violation involves a search conducted pursuant to a warrant, 'the fact that a neutral magistrate has issued a warrant is the clearest indication that the officer acted in an objectively reasonable manner.'" *Johnson v. Holmes*, 204 F. Supp. 3d 880, 886 (W.D. Va. 2016) (quoting *Messerschmidt v. Millender*, 565 U.S. 535 (2012)). Here, the collection of DNA evidence from Plaintiff, including from his genital region, was authorized by a valid search warrant. (*See* Ex. A to Defs.' Mot. for Summ. J.) And although Plaintiff claims that certain potentially unreasonable behaviors were displayed during the collection process, Defendants evidence conclusively refutes Plaintiff's allegations that Plaintiff was threatened, humiliated, or caused unnecessary pain during the collection of the DNA evidence from his genital area. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.); *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) ("[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)).

Here, the video evidence submitted by Defendants evidence reveals nothing unsterile about the collection and shows that Madison took care to ensure Plaintiff was not exposed in any video recording and left Plaintiff unclothed for no longer than necessary to complete the collection. (*See id.*; Ex. C to Defs.' Mot. for Summ. J. ¶¶ 8–10.) Defendants' evidence further conclusively shows that Plaintiff did not ask Madison to stop or make any perceivable signs of pain during the collection. (Ex. B, Att. A to Defs' Mot. for Summ. J.; Ex. C to Defs.' Mot.

for Summ. J. ¶ 13.) Based on the evidence in the record, no reasonable jury could find that the search of Plaintiff's person for DNA evidence was unreasonable. The court will therefore grant Defendants' motions for summary judgment as to these claims.

Second, Plaintiff cannot succeed on a § 1983 claim based on the fact that he was searched after asking for an attorney to be present during the collection of DNA evidence. There is no Sixth Amendment right to counsel during the collection of a DNA sample. *See United States v. Lewis*, 483 F.3d 871, 874 (8th Cir. 2007) ("[T]he collection of the buccal swab and the Government's subsequent use of the DNA results did not violate Lewis's Sixth Amendment right to counsel.").

To the extent that Plaintiff alleges that he was subject to a custodial interrogation triggering his Fifth Amendment right to counsel, Plaintiff cannot succeed on that claim either. The Fifth Amendment right to counsel derives from and "is bounded by" the right against self-incrimination. *United States v. Melgar*, 927 F. Supp. 939, 949–50 (E.D. Va. 1996), *aff'd*, 139 F.3d 1005 (4th Cir. 1998). And the text of the Fifth Amendment precludes compelled testimony against oneself in a "criminal case." *See* U.S. Const. amend. V. Based on this language, a plurality of the Supreme Court has held that a plaintiff cannot establish a § 1983 claim when he or she "was never prosecuted for a crime" based on his incriminating testimony allegedly elicited in violation of the Fifth Amendment. *Chavez v. Martinez*, 538 U.S. 760, 766 (2003). Although the Supreme Court has not decided "the precise moment when a 'criminal case' commences" for Fifth Amendment purposes, *see id.*, Fourth Circuit precedent dictates that the right is not violated until the coerced statements are used against the speaker at a criminal trial, *see Burrell v. Virginia*, 395 F.3d 508, 513–14 (4th Cir. 2005) ("[Plaintiff] does not

allege any *trial* action that violated his Fifth Amendment rights; thus, *ipso facto,* his claim fails

on the [*Chavez*] plurality's reasoning.") (emphasis in original); *Riley v. Dorton*, 115 F.3d 1159,

1165 (4th Cir. 1997), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010) ("Any

Fifth Amendment claim here thus fails, because [Plaintiff] never made a statement, much less

a statement that was used at trial."). Thus, to establish a Fifth Amendment violation, Plaintiff

must show that any statements elicited from him during the DNA collection process were

used against him in a criminal trial. *See Burrell*, 395 F.3d at 513–14.

Plaintiff has not alleged—much less shown that there is a genuine dispute of fact—

that any statement he made to Madison on February 25, 2023, after he requested an attorney

has been used against him in a criminal proceeding.[2] Accordingly, there is no evidence from

which a reasonable jury would find that proceeding with the DNA collection, or even asking

questions of Plaintiff, after he requested his attorney's presence constituted a Fourth, Fifth, or

Sixth Amendment violation, and the court will grant Defendants' motions for summary

judgment as to these claims.

Finally, Plaintiff cannot show that Defendants unlawfully seized his car keys, weapons,

ammunition, or weapons accessories. Defendants' unrefuted evidence shows that Plaintiff

voluntarily surrendered these items after he became aware of the protective order that required

him not to carry weapons. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.) Because Plaintiff

consented to the seizure, no reasonable jury would find that it violated the Fourth

Amendment. *See United States v. Smith*, 395 F.3d 516, 520 (4th Cir. 2005) (finding seizure within

---

[2] Plaintiff has since been arrested and convicted of several criminal offenses, including armed burglary and murder, and is serving a life sentence in the custody of the Virginia Department of Corrections. But this fact alone does not establish that any statement from the February 25, 2023 exchange was used against him in a criminal trial. *See Burrell*, 395 F.3d at 513–14.

the scope of the subject's consent was reasonable within the meaning of the Fourth Amendment). Accordingly, Defendants are entitled to judgment as a matter of law on this claim.

## B. Eighth Amendment Claim

Plaintiff alleges that Defendants violated his Eighth Amendment rights based on the manner in which they collected DNA from Plaintiff's genital area and by locking him outside in the cold after he was allowed to leave. (Compl. at 62.) But the Eighth Amendment's right to be free from cruel and unusual punishment does not attach until after a person has been convicted of a crime. *See Meyler v. Mayor & City Council of Ocean City*, 736 F. Supp. 3d 272, 292 (D. Md. 2024); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). Moreover, Defendants' uncontroverted evidence shows that Madison did not act aggressively or appear to cause Plaintiff any pain during the DNA collection or afterward. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.; Ex. C to Defs.' Mot. for Summ. J. ¶¶ 8–13.) The court will therefore grant Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claims.

## C. Fourteenth Amendment Claims

Lastly, Plaintiff claims that Madison violated his Fourteenth Amendment rights to equal protection and due process. But these claims are based entirely on a version of the events that is flatly refuted by the video evidence of Plaintiff's interactions with Madison. (*See* Ex. B, Att. A to Defs.' Mot. for Summ. J.; Ex. B, Att. C to Defs.' Mot. for Summ. J.) Specifically, these claims are based on Plaintiff's allegations that Madison blackmailed and distorted him.

(Compl. at 63.) But the evidence here so one-sidedly contradicts those allegations as to show that Defendants must prevail as a matter of law. *See Tekmen*, 55 F.4th at 959. Accordingly, the court will grant Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment claims as well.

## IV.

For the reasons discussed above, the court will grant Defendants' motions for summary judgment (ECF Nos. 34, 53) and dismiss this action.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 31st day of March, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE